**AMERICAN DIRECTORY SERVICE AGENCY, Plaintiff,**

v.

**Amy BEAM, Defendant.**

**Civ. A. No. 87–1653.**

United States District Court, District of Columbia.

March 30, 1990.

## REPORT AND RECOMMENDATION

DEBORAH A. ROBINSON, United States Magistrate.

### INTRODUCTION

This copyright infringement case was referred to the undersigned United States Magistrate for supervision of discovery, a pretrial conference, and for report and recommendation on dispositive motions. Currently pending for consideration by the undersigned are:

(1) the Motion to Dismiss filed on October 14, 1988 by individual counterclaim defendants R. Clay Kime ("Kime") and Michael D. Tracy ("Tracy");

(2) the Motion for Sanctions filed on August 31, 1989 by defendant and counterclaimant Amy L. Beam Ed.D. ("Beam"); and

(3) the Cross–Motion for Sanctions filed by counterclaim defendants Kime and Tracy on September 13, 1989.

Upon consideration of the motions, the oppositions, the supplemental briefs filed by the parties, the transcripts of the depositions of Tracy and Kime taken in August, 1989 and the entire record herein, and for the reasons set forth below, it is recommended that the Motion to Dismiss be denied; that Beam's Motion for Sanctions be granted; and that the Cross–Motion for Sanctions filed by counterclaim defendants Kime and Tracy be denied.

### BACKGROUND

The facts giving rise to this litigation were set forth at length by the Court (Pratt, J.) in its Order granting, *inter alia*, Beam's motion to add counterclaim defendants, filed March 28, 1988 (the "March 28 Order"). Thus, they will be abbreviated here. Plaintiff American Directory Service Agency, Inc. ("ADS") is in the business of selling advertising space in the "yellow pages" of telephone directories. Defendant Beam is a computer programmer and consultant, who holds a doctorate in education. In 1984, ADS and Beam entered into a consulting agreement whereby Beam agreed to develop a software program compatible with computer equipment used by ADS. The consulting agreement specified that the copyright of the software program would be applied for in the names of Beam *and* the president of ADS, John Stimac.

During 1985, Beam developed the software, along with an accompanying user's manual. In 1986, she entered into a joint marketing agreement with Datacomp Corporation to sell the software programs. Sales totalled more than $70,000 in the first year. Thereafter, in April, 1987, Beam applied for, and received, copyright registration of the software in her own name. Two months later, ADS claimed that it had se-

cured a copyright for the software. In June, 1987, ADS filed the instant action against Beam for monetary, injunctive, and declaratory relief for her alleged breach of the consulting agreement.[1]

On March 25, 1988, Beam filed a counterclaim against ADS and the following counterclaim defendants:

(1) John Stimac, the president of ADS;

(2) Datacomp Corporation, with whom Beam entered into the joint marketing agreement;

(3) R. Clay Kime, the president and controlling shareholder of Datacomp corporation; [2]

(4) The National Yellow Pages Information Services Company, a subsidiary of Datacomp ("National Yellow Pages"); and

(5) Michael D. Tracy, the vice-president of Datacomp.[3]

Beam is a citizen of the District of Columbia.[4] Datacomp is a Virginia corporation.[5] Counterclaim defendants Kime and Tracy are residents of the Commonwealth of Virginia.[6] Each avers that he has not "personally done business in the District of Columbia." [7]

In her counterclaim, Beam makes the following allegations. In November, 1985, before the software program was completed, the president of ADS, John Stimac, terminated the consulting agreement between Beam and ADS. Therefore, Beam completed and revised the software at her own expense, and registered her "copyrighted" computer software programs in April, 1987. Thereafter, she entered into a joint marketing agreement with Datacomp, by which she granted Datacomp a license to use the software programs and the user's manual. During the first year, sales

of the software totalled approximately $70,000.

In 1986, unbeknownst to Beam, Datacomp and ADS entered into an agreement by which ADS purported to license Datacomp to sell the software, and Datacomp agreed to pay ADS a designated payment for each sale. Datacomp created the National Yellow Pages to market the software.[8]

Beam seeks monetary and injunctive relief from the counterclaim defendants for Copyright Infringement (Counterclaim, Count I); Breach of Contract by Datacomp (Counterclaim, Count II); Interference with Contract (Counterclaim, Count III); and Unfair Competition (Counterclaim, Count IV).

## PROCEDURAL POSTURE

On June 3, 1988, counterclaim defendants Datacomp, National Yellow Pages, Kime and Tracy filed a motion to dismiss the counterclaim on the grounds that this court lacks personal jurisdiction over them. Upon consideration of the motion, the Court found that it could not address the issue of jurisdiction until additional facts were developed during discovery. Accordingly, the motion to dismiss was denied, without prejudice to renew it after further discovery was completed. June 20, 1988 Order of the Court at 2–3.

On October 14, 1988, the individual counterclaim defendants Kime and Tracy (hereinafter "counterclaim defendants") brought a second Motion to Dismiss the counterclaim. That motion became ripe in or about October, 1989, and is currently pending for resolution. At issue is whether the counterclaim defendants had sufficient minimum contacts with the District of Columbia so that this court's exercise of juris-

---

1. *See generally* March 28 Order at 1–3.

2. Counterclaim, paragraph 6.

3. Transcript of deposition Michael Tracy, taken February 20, 1989, at 5:21.

4. Counterclaim, paragraph 2.

5. *Id.,* paragraph 5.

6. Affidavit of R. Clay Kime and Affidavit of Michael Tracy in Support of Counterclaim Defendants' Motion to Dismiss, paragraphs 3 and 4, respectively.

7. Kime affidavit, paragraph 7; Tracy affidavit, paragraph 6.

8. *See generally* Counterclaim, paragraphs 6–8.

diction over them pursuant to the applicable "long-arm" statute does not violate the notion of fundamental fairness. Counterclaim defendants do not contest that they had numerous contacts with the instant forum on behalf of their employer, Datacomp Corporation. However, they claim that they had no contacts within the District of Columbia in their individual capacities. For that reason, they maintain that pursuant to the "corporate shield" doctrine, the court cannot exercise jurisdiction over the individuals, whose only contacts with this forum were on behalf of their employer. Memorandum in Support of Motion to Dismiss at 3–4.

On November 4, 1988, Beam filed her Opposition to the Motion to Dismiss. In support thereof, she submitted the transcript of the deposition of a former vice-president of Datacomp, Richard Suslick, taken on October 24, 1988 ("Suslick deposition"), who testified that the District of Columbia was "one of the major areas of focus of Datacomp's sales," [9] and that both Kime and Tracy made sales calls in the District of Columbia.[10]

On February 7, 1989, in accordance with certain rulings made after a discovery status conference, the undersigned ordered that Beam would be allowed to take the depositions of Kime and Tracy for the purpose of eliciting additional facts concerning their contacts within this forum. The scope of the depositions was limited to "the activities of individual counter-defendants Kime and Tracy relevant to the Court's exercise of personal jurisdiction over them." February 7, 1989 Order of the undersigned at 2. The parties were granted additional time, after the completion of the depositions, in which to file supplemental memoranda in support of or in opposition to the Motion to Dismiss. *Id.*

Accordingly, on February 20, 1989, Beam took the depositions of Kime and Tracy. However, their attorney, Laurance J. Ochs, asserted that the scope of the depositions was limited to the deponents' activities within the District of Columbia in their individual capacities. Therefore, he instructed the deponents not to answer any questions concerning their activities on behalf of Datacomp. Because neither Kime nor Tracy admits to having any contacts whatsoever within the District of Columbia in an individual capacity, very little information was adduced at the depositions. *See generally* Transcript of Depositions of Michael D. Tracy and Robert C. Kime, Jr., taken February 20, 1989 and filed with the court on May 25, 1989.[11]

Beam subsequently filed a motion to compel the deposition testimony of Kime and Tracy, on the grounds that their counsel, Mr. Ochs, thwarted her efforts to inquire about their activities within the District of Columbia. As justification for their refusal to answer questions about their activities on behalf of Datacomp, counterclaim defendants relied on the "corporate shield" doctrine.

Upon consideration of the motion to compel, the undersigned found that there was no authority which provided that the "corporate shield" doctrine is grounds for an instruction to a witness not answer questions at a deposition. It was emphasized that Fed.R.Civ.P. 30(c) provides that "evidence objected to shall be taken subject to the objections." Accordingly, Beam's motion to compel the deposition testimony was granted. Specifically, the Order directed that counterclaim defendants would

answer deposition questions concerning their activities in the District of Columbia on behalf of Datacomp Corporation

---

**9.** Suslick deposition at 15:9–10, attached as an exhibit to Beam's Memorandum in Opposition to Motion to Dismiss.

**10.** *Id.* at 11:15–20.

**11.** For example, during the Tracy deposition, Mr. Ochs stated, "[the witness] is not here as an, an employee of Datacomp. He is here in his individual capacity.... [I]t is your matter to

prove that there is jurisdiction over Mr. Tracy as an individual. Now you can inquire all you want of him as an individual, but if we are going to get into [the issues] with regard to what Datacomp does in the District of Columbia, ... I think that is beyond the scope of this court's order." Tracy Deposition taken February 20, 1989 at 12:10–13:6.

subject to any objections which may be interposed by their counsel.

July 17, 1989 Order of the undersigned (the "July 17 Order") at 4.

The depositions of Tracy and Kime were reopened on August 9 and 10, 1989, respectively. Their counsel, Mr. Ochs, took the position that the depositions were not "general discovery depositions." Reply to Opposition to Cross–Motion for Sanctions at 1. He interposed numerous objections, and instructed the witnesses not to answer questions that he deemed were beyond the scope of the deposition. *See generally* Kime Deposition taken August 10, 1989, (Filed Under Seal), and Tracy Deposition taken August 9, 1989, attached as Exhibits A and B, respectively, to Memorandum in Support of Motion for Sanctions.

Accordingly, on August 31, 1989, Beam brought a Motion for Sanctions against Mr. Ochs, on the grounds that he thwarted the conduct of any meaningful discovery by his repeated objections, instructions to the witnesses not to answer and other allegedly disruptive tactics. Memorandum in Support of Motion for Sanctions at 1–2. Along with the motion, Beam submitted an affidavit of Richard Suslick, in which he provides the following additional evidence concerning counterclaim defendants' contacts with the District of Columbia. Suslick was employed by Datacomp from 1985 to 1987. During that time, he was accompanied from time to time by Kime and Tracy when he called on customers in the District of Columbia. Furthermore, he learned from his own observations and from conversa-

tions with Kime and Tracy that they each called on customers in the District of Columbia on a "regular basis," averaging at least one visit per week. Finally, Suslick lists fourteen of Datacomp's customers to whom either Kime or Tracy made numerous sales in the District of Columbia. *See* Affidavit of Richard Suslick dated August 29, 1989, attached as Exhibit C to Memorandum in Support of Motion for Sanctions ("Suslick affidavit").[12]

Counterclaim defendants, in turn, filed a Cross–Motion for Sanctions against Beam's counsel, Mr. Charles Claxton, for, *inter alia,* his "willful failure to comply with court ordered discovery." Memorandum in Opposition to Motion for Sanctions and in Support of Cross–Motion for Sanctions at 1–2. The essence of that motion is that Beam's attorney violated the Orders of this court by asking questions on topics outside the scope of the deposition.

Finally, on November 7, 1989, counterclaim defendant Datacomp Corporation filed for relief in the United States Bankruptcy Court for the Eastern District of Virginia. Accordingly, Datacomp requested that the instant litigation be stayed pending further proceedings in the Bankruptcy Court. *See* Suggestion in Bankruptcy, filed November 9, 1989. The Court granted Datacomp's request, and ordered that this litigation be stayed until thirty days after the conclusion of the bankruptcy proceedings. November 16, 1989 Order of the Court.

Thereafter, pursuant to motions by the parties, the Court ordered that the stay be

---

**12.** Counterclaim defendants object to the use of the affidavit because they claim that disclosure of the names of Datacomp's customers violates the protective order entered into by the parties, and because Suslick's statement that a specific federal agency was a Datacomp customer during his employ is allegedly perjurious. *See* Memorandum in Opposition to Motion for Sanctions and in Support of Cross–Motion for Sanctions at 19–20.

In response, Beam asserts that most of the customers listed in the affidavit are government agencies whose contracts are a matter of public record. Memorandum in Opposition to Cross–Motion for Sanctions at 3. Moreover, the identities of other Datacomp customers disclosed in the affidavit were made public in the context of

other litigation in which Datacomp was involved. Memorandum in Support of Motion for Sanctions at 10. Finally, Beam denies the contention that Suslick's affidavit is perjurious.

The arguments submitted by counterclaim defendants only serve to obscure the issue at bar. Even assuming, *arguendo,* that each of their allegations is true, there is nothing in the record to contradict the evidence that Kime and Tracy had numerous, regular business contacts in the District of Columbia on behalf of Datacomp. Whether the names of Datacomp's customers should have been disclosed, or whether such disclosure violates the protective order entered into by the parties is not at issue, and will not be decided here.

lifted for the sole purpose of allowing resolution of the instant motions. *See* January 23, 1990 and March 12, 1990 Orders of the Court.

Each motion will be discussed in turn.

## THE MOTION TO DISMISS

■ Counterclaim defendants advance three grounds in support of their Motion to Dismiss. First, they argue that claims for copyright infringement and unfair competition are not tort claims, but statutory claims. Therefore, they assert that the District of Columbia's long-arm statute does not apply in this case. Memorandum in Support of Motion to Dismiss at 4. This argument is frivolous. It is well settled in this jurisdiction that a claim for copyright infringement sounds in tort. *Stabilisierungsfonds Fur Wein v. Kaiser*, 647 F.2d 200, 207 (D.C.Cir.1981) (defendants in copyright infringement cases may be sued as joint tortfeasors); *Costello Publishing Company v. Rotelle*, 670 F.2d 1035, 1043 (D.C.Cir.1981) ("it is well established that a suit for [copyright] infringement is analogous to other tort actions and infringers are jointly and severally liable").

■ Second, counterclaim defendants contend that venue in the District of Columbia is improper because the counterclaims did not "arise" in the District. Memorandum in Support of Motion to Dismiss at 5. Again, this claim is not supported by the authorities. *See Horne v. Adolph Coors Co.*, 684 F.2d 255, 259–260 (3d Cir.1982) (situs of the property damaged by alleged wrongdoing in intellectual property case is residence of the owner).

Finally, counterclaim defendants submit that the "corporate shield" doctrine protects them from suit in this forum. Resolution of the motion turns on this issue.

This court may assert personal jurisdiction over a defendant if two conditions are fulfilled. First, the plaintiff must demonstrate that the District of Columbia long-arm statute authorizes service of process of the defendants. Second, the plaintiff must show that such a provision is consistent with the constitutional principles of due process. *Chase v. Pan–Pacific Broadcasting, Inc.*, 617 F.Supp. 1414, 1419 (D.D.C. 1985). The parties agree that the applicable long-arm statute is D.C.Code § 13–423(a)(4), which provides that:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

The exercise of personal jurisdiction is proper only if the defendant's contacts with the forum are of a sufficient quantity and quality that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). This "minimum contacts" test cannot be applied mechanically, however. Rather, it will vary with the quality and nature of the defendant's activities. *Kulko v. Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978). In all cases, a defendant's connection with the forum state must be "such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Finally, jurisdiction may only be asserted when the defendant "purposefully direct[s] his activities at residents of the forum." *Id.*

■ In the instant case, it is evident that between 1985 and 1987, counterclaim defendants "purposefully directed their activities" at the residents of the District of Columbia in the course of their business activities on behalf of Datacomp. In fact, they came into the District on business at least once a week, and sometimes more frequently. Suslick deposition at 11:15–20; Suslick affidavit, paragraphs 5–7 and paragraph 9. Although counterclaim defen-

dants staunchly maintain that they had no contacts within this forum in their individual capacities, they have submitted nothing to dispute the conclusion that they had regular contacts within the District as part of their business dealings. Accordingly, the undersigned is satisfied that each counterclaim defendant maintained a sufficient quantity and quality of contacts with the District of Columbia so that the exercise of personal jurisdiction over each of them would not violate the principles of due process.

### The "Corporate Shield" Doctrine

■ The "corporate shield" doctrine, also referred to as the "fiduciary shield" doctrine, provides an equitable restriction on the assertion of jurisdiction. *Zeman v. Lotus Heart, Inc.,* 717 F.Supp. 373, 376 (D.Md.1989). The underpinning of the doctrine is the notion that

> it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit, but for the benefit of his employer.

*Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 902 (2d Cir.1981).

The doctrine has been recognized in two cases in this jurisdiction. *See Security Bank, N.A. v. Tauber,* 347 F.Supp. 511, 516 (D.D.C.1972) (Flannery, J.) (D.C.Code § 13–423(a)(4) is unavailable as a basis of jurisdiction when *corporation* transacted substantial business within the District of Columbia through *its* agents, but individual defendant, the president and minority stockholder of corporation, transacted none) (emphasis in original); *Quinto v. Legal Times of Washington, Inc.,* 506 F.Supp. 554, 558 (D.D.C.1981) (Flannery, J.) (there was no long-arm jurisdiction over corporate officers and part owners of parent company of defendant publisher absent allegation that they conducted any business as individuals in the District of Columbia). The gravamen of the Motion to Dismiss is that the "corporate shield" doctrine neces-

sarily applies in this case, because the counterclaim defendants' only contacts with this forum were made on behalf of their employer. Memorandum in Support of Motion to Dismiss at 3–4; Reply Memorandum to Opposition to Motion to Dismiss, filed November 9, 1988, at 3.

■ However, the doctrine cannot be applied as mechanically as counterclaim defendants suggest. Whether the "corporate shield" doctrine will apply in a particular case depends entirely on whether it will advance the notions of fairness to allow an individual to invoke its protection. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d at 903. In some cases, it will not. For example, the United States Court of Appeals for the Second Circuit noted that

> [a]s the term "fiduciary shield" suggests, this is an equitable doctrine. It should be followed not mechanically, but with a sound exercise of discretion. If, for example, the corporation lacked sufficient assets to respond .... *the balance of fairness might be tipped and jurisdiction over the individual might lie.*

*Id.* at 903 (emphasis added).

■ Upon consideration of the circumstances of the instant case, and for the reasons set forth below, the undersigned finds that the balance of fairness weighs in favor of counterclaimant Beam. Accordingly, the exercise of personal jurisdiction over the individual counterclaim defendants is proper. First, the evidence that the counterclaim defendants and their attorney have consistently failed to cooperate with the Orders of the Court and the undersigned that additional discovery be conducted in order to more fully evaluate the jurisdictional issues substantially tips the balance of fairness in favor of Beam. Counterclaim defendants were on notice that resolution of their Motion to Dismiss would necessarily turn on facts developed during discovery; indeed, discovery was reopened three times in order to allow Beam to explore the facts underlying counterclaim defendants' claims.[13] Furthermore, counter-

---

13. *See* Order filed by Judge Pratt on June 20, 1988 at 3 (additional discovery needed to rebut the allegations pertaining to lack of personal jurisdiction so that the court "will be in a posi-

claim defendants were on notice that the facts surrounding the jurisdictional issues may be the same facts which go to the merits of case, specifically to the liability of Datacomp. *See, e.g., Chase v. Pan–Pacific Broadcasting, Inc.,* 617 F.Supp. at 1423 ("corporate shield" doctrine confuses procedural issues relating to the court's power to adjudicate the claim and substantive issues relating to liability).

Nonetheless, counterclaim defendants failed to provide any facts which would assist the court in resolving the Motion to Dismiss. In fact, the record indicates that their counsel effectively obstructed Beam's efforts elicit any such information. For example, when Kime and Tracy were initially deposed on February 20, 1989, their attorney, Mr. Ochs, made a blanket assertion that he would instruct the witnesses not to answer any questions that did not relate to their contacts within the District in their individual capacities. *See* Kime and Tracy Depositions taken February 20, 1989. Beam's ensuing motion to compel their testimony was granted, and the counterclaim defendants were specifically directed to answer the questions, subject to the objections of counsel.

The transcripts of the reconvened depositions reveal that Mr. Ochs objected to so many questions, engaged in so many arguments with opposing counsel and interposed so many requests for a clarification of terms, that virtually no facts relating to the issues at bar could be elicited from either deponent.

As just one example, the Tracy deposition opened with the following colloquy:

Q: Mr. Tracy, is your home address the same as it was the beginning (sic) of the deposition the last time?

A: Yes.

Q: How about your work address?

MR. OCHS: Objection.

Q: That's an objection for the record, Mr. Tracy, you can go ahead and answer.

A: Now my work address is different.

Q: Where are you now working?

A: I work for JR Associates.

Q: Just briefly, what is JR Associates?

MR. OCHS: Objection as to relevancy. Mr. Claxton, the limit of this examination is as I stated it. We are not going to do another full deposition because of changed circumstances of Mr. Tracy between the last deposition and this deposition which has absolutely nothing to do with this case.

MR. CLAXTON: The question is still pending.

MR. OCHS: Instruct the witness not to answer.

Tracy Deposition taken August 9, 1989 at 3:19–4:16, attached as Exhibit B to Beam's Memorandum in Support of Motion for Sanctions.

In addition, Mr. Ochs demanded clarification of almost every question. For example, he engaged opposing counsel in the following exchange:

Q (BY MR. CLAXTON): How about direct mail, was any of the direct mail marketing into the District of Columbia?

MR. OCHS: I am going to object. Number one, there is no time that you are referring to. Number two, it is unclear to me whether you are referring to the business of Datacomp unrelated to the software issue, software that you mentioned earlier, which I believe he has answered his activity and whether your question is now just going to the general business of Datacomp.

MR. CLAXTON: The question was simply whether, Mr. Tracy, some of the direct mail marketing that you mentioned in your earlier answer was directed into the District of Columbia?

MR. OCHS: Direct mail marketing of what, is what I'm objecting to. There has been no definition of "what"....

MR. CLAXTON: My question, Mr. Tracy, is simply whether the direct mail mar-

tion to address the motion in an intelligent fashion"); and the Orders filed by the undersigned on February 7, 1989 and July 17, 1989 (counterclaimant allowed to take further deposi-

tions of counterclaim defendants in order to establish the extent and nature of their contacts in the District of Columbia).

keting that you mentioned was in part directed into the District of Columbia?

A: I don't recall.

Q: [Other] than trade shows and direct mail—

MR. OCHS: Objection. There has been no testimony that there was direct mail into the District of Columbia.

MR. CLAXTON: I didn't finish the question.

Q: Other than—

MR. OCHS: You don't have to finish the question.

\* \* \* \* \* \*

Q: (BY MR. CLAXTON): Now ... what activities as an employee of Datacomp fell into the category of sales?

MR. OCHS: In the District of Columbia, or generally?

MR. CLAXTON: Generally.

MR. OCHS: Does the generally include the District of Columbia?

MR. CLAXTON: Presumably, but we haven't gotten to that question yet.

MR. OCHS: Well, then I'm going to object.

*Id.* at 30:13–32:21.

The Tracy deposition and the Kime deposition are replete with similar exchanges. As a result, the transcripts are useless. Any substantive testimony that may have been given by either deponent is obscured by Mr. Ochs' repeated interruptions and arguments. Accordingly, the only facts before the undersigned on which an analysis of the jurisdictional issues can be based are those set forth in the Suslick deposition and the Suslick affidavit submitted by Beam in opposition to the Motion to Dismiss.

Next, counterclaim defendant Datacomp Corporation has filed for bankruptcy. Application of the "corporate shield" doctrine to Kime and Tracy, who are principals of Datacomp, when the corporation has sought the protection of a bankruptcy court, would effectively deprive Beam of an opportunity to obtain judicial review of her counterclaims against Datacomp Corporation or its principals. With respect to this consideration, the balance of fairness again tips in favor of counterclaimant

Beam. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d at 903 (equity may demand that personal jurisdiction lie over individual, despite assertion of "corporate shield" doctrine, if corporation lacks sufficient assets to respond).

Finally, the evidence before the undersigned suggests that Datacomp was not merely counterclaim defendants' employer who paid them a regular salary. Each was a principal of the corporation, and Kime was the sole, or controlling shareholder. It is not unreasonable to conclude that Kime and Tracy derived a significant portion of their income from the sales generated by their efforts in the District of Columbia.

In *Zeman v. Lotus Heart, Inc.,* 717 F.Supp. 373 (D.Md.1989), under circumstances remarkably similar to those in the case at bar, the "corporate shield" doctrine was found inapplicable to the individual defendants. In that case, plaintiff sued Lotus Heart, Inc., a California corporation, and its principals, John and Suzy Burrows, in connection with a licensing agreement between plaintiff and defendant Lotus Heart for the manufacture and sale of certain barrettes on which plaintiff held a patent. The Burrowses were citizens of Texas and California, respectively. *Id.* at 375. They were directors of the corporation and served as its president and vice-president. John Burrows provided all of the capital and financing for the corporation. *Id.* at 377. In connection with the disputed licensing agreement, the Burrowses made various trips to Maryland, which amounted to contacts of sufficient quality and quantity to justify the court's exercise of jurisdiction over the corporate defendant. *Id.* Furthermore, the court found that, focusing only on the nature of the contacts under the constitutional standards as defined in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, "the exercise of personal jurisdiction over the Burrowses would not violate principles of due process." 717 F.Supp. at 375.

The Burrowses argued that because their only contacts with Maryland were in connection with the business of Lotus Heart, the "fiduciary shield" doctrine should pro-

tect them from suit in that forum. *Id.* The court acknowledged that the doctrine is recognized by Maryland courts. *Id.* However, in analyzing the factors relevant to the notion of fairness, the court found that when

an employee has derived a *direct and substantial financial benefit* from the business he conducts in the state .... then he may not avail himself of the protection of the fiduciary shield doctrine.

*Id.* at 377 (emphasis added). The court reasoned that:

An employee may have a sufficient financial stake in the business conducted in the state by way of commissions, dividends or other compensation directly related to the business if the extent of the employee's financial stake is such that it would be unfair to permit the employee to interpose the protection of the fiduciary shield doctrine. The same could be true where principals of a corporation voluntarily enter the state to transact business primarily for their personal benefit, albeit through a corporate form. The analysis must measure the extent of the individual interest of the employee in the business that is connected to the state.

*Id.* The court held that under the circumstances, the fiduciary shield doctrine could not be invoked to protect the individual defendants from suit in Maryland. *Id.* at 378.

In the instant case, Datacomp was a small company with fewer than 15 employees. Suslick Affidavit, paragraph 2. Kime was the president and the sole or controlling shareholder. Tracy was initially Datacomp's director of marketing and later its vice president.[14] Thus, all the evidence suggests that each counterclaim defendant had a direct and substantial interest in Datacomp Corporation; neither has disputed that he benefited directly from the revenues generated by his sales efforts in the District of Columbia. Simply put, the available evidence indicates that the counterclaim defendants had a sufficient finan-

cial stake in the business of Datacomp by way of commissions, dividends or other compensation directly related to the business so that it would be unfair to permit them to interpose the protection of the "corporate shield" doctrine. *Zeman v. Lotus Heart, Inc.,* 717 F.Supp. at 377.

For the foregoing reasons, in the interests of equity and fundamental fairness, the undersigned finds that counterclaim defendants cannot avail themselves of the "corporate shield" doctrine to avoid the assertion of personal jurisdiction over them.

## THE MOTIONS FOR SANCTIONS

■ As is more fully discussed above, counsel for counterclaim defendants, Mr. Ochs, effectively thwarted Beam's attempts to take their depositions. He repeatedly interrupted opposing counsel's questions by interposing objections and demands for clarification which the undersigned finds served only to obstruct the questioning.

In *Unique Concepts, Inc. v. Brown,* 115 F.R.D. 292 (S.D.N.Y.1987), the court imposed sanctions on an attorney who conducted himself in a similar fashion during a deposition. Specifically, the court stated that

[i]t is hard to find a page [of the deposition transcript] on which [counsel] does not intrude on the examination with a speech, a question to the examiner, or an attempt to engage in colloquy distracting to the examiner. [Counsel's] constant interruptions continue throughout the transcript; his silencing of the witness and obstructive demands for explanations from the examiner rendered the deposition worthless and an exercise in futility.

*Id.* at 292–293.

In the instant case, the Tracy and Kime depositions, taken on August 9 and 10, 1989, respectively, are replete with the same sort of obstructive interruptions, questions to opposing counsel, and demands for explanations that the court

---

14. Tracy Deposition, taken February 20, 1989, at 5:17–21.

found worthy of sanction in *Unique Concepts.*

In his Cross–Motion for Sanctions, Mr. Ochs asserts that his conduct was proper, because counsel for Beam attempted to conduct a "general discovery deposition," and some of the questions were beyond the permitted scope of the depositions. Memorandum in Opposition to Motion for Sanctions and in Support of Cross–Motion for Sanctions at 5. However, counsel was on notice that Fed.R.Civ.P. 30(c) mandates that questions be answered *subject* to any objections. July 17, 1989 Order at 3. Moreover, as noted above, at least some of the evidence concerning counterclaim defendants' contacts within the District of Columbia will necessarily overlap with evidence concerning Datacomp's liability. In some instances, it would be impossible to ask a question that would not elicit information that went to both the procedural and the substantive issues. Mr. Ochs' rigid insistence that no "general discovery" information could be elicited was misplaced. The undersigned finds that both his defense of his own conduct and his attempt to lay the blame at the feet of opposing counsel are groundless.

### CONCLUSION

Accordingly, for the reasons set forth above, it is, this 30th day of March, 1990,

RECOMMENDED that the Motion to Dismiss filed by counterclaim defendants R. Clay Kime and Michael D. Tracy on October 14, 1988 be DENIED; and it is

FURTHER RECOMMENDED that the Motion for Sanctions filed by counterclaimant Amy L. Beam, Ed.D. on August 31, 1989 be GRANTED; and it is

FURTHER RECOMMENDED that the Cross–Motion for Sanctions filed by counterclaim defendants Kime and Tracy on September 13, 1989 be DENIED; and it is

FURTHER RECOMMENDED that as sanction for his obstructive conduct during the depositions of counterclaim defendants Tracy and Kime, taken on August 9 and 10, 1989, respectively, Mr. Laurance J. Ochs be ordered to pay to Beam her costs, including attorney's fees, of taking the depositions, and of bringing her Motion for Sanctions; and it is

FURTHER RECOMMENDED that the foregoing sanctions be imposed against Mr. Ochs individually, and that he not be reimbursed for them by the individual counterclaim defendants.